Thank you, Your Honor. My name is Peter Snow of Laidlaw and Watkins. I'm joined today by my colleague, Native Lee Tully. We represent the appellant, Mr. Willie. The firm took this on pro bono? Yes, we took this on pro bono, Your Honor. Thank you for doing that. You're welcome. I'd like to reserve a couple minutes for referral. That's okay. There are three issues before the Court today. The first issue is whether the District Court applied the proper legal standard under the 14th Amendment to evaluate Mr. Willie's Section 1983 claim for failure to provide adequate medical care. The second issue is whether the District Court abused its discretion by denying Mr. Willie's multiple requests for counsel until after it ruled on appellee's motions for summary judgment. And the third issue is whether the District Court abused its discretion by entering summary judgment against Mr. Willie on multiple claims without providing him the opportunity to obtain adequate discovery. Well, there was a counsel at some point before the District Court, right? That's correct, Your Honor. When did that come about? After the Court ruled on the motions for summary judgment, one claim of Mr. Willie survived, and the District Court then appointed counsel to take that claim through trial. Okay. That wasn't you, though? No, it wasn't. Okay. All right. So we had other counsel that went through the trial, and he lost on the trial? Correct, on one claim. There were three claims, basically three claims construed in the complaint, Your Honor. One claim was for excessive force by the county appellees. One claim was for failure to provide adequate medical treatment by the medical personnel at the detention facility. And the third claim was that the county's practices at the detention facility employed excessive force. And which one went to trial? One claim for excessive force against one county appellee went to, or it's actually not a county appellee, one county defendant went to trial. And so I'd like to begin, if Your Honors don't mind, with the Fourteenth Amendment question, because I believe that that is one of the most important issues here in this appeal. It's clearly central to the appeal. Has the Ninth Circuit ever said that pretrial detainees, in terms of the conditions of confinement, medical treatment, et cetera, are held to a different or lower standard than those serving a sentence post-conviction? The Ninth Circuit has never held that a lower standard applies to a pretrial detainee or someone who's been detained by the State yet has not been convicted of any crime, like Mr. Willey. The Ninth Circuit has recognized that greater protection might be afforded to someone in this position under the Fourteenth Amendment than the standard that would be applied under the Eighth Amendment to prohibit that which prohibits cruel and unusual punishment. This particular correctional facility, this Sonoma County Jail? That's correct, Your Honor. Does it segregate pretrial detainees from those serving sentence? Your Honor, I don't know. I don't know if they are segregated from the general population or not. Could this panel adopt a lower standard without an embankment? Your Honor, I believe that this Court could adopt a lower standard without an embankment hearing, although I have not researched that issue. What standard would you have us apply? If you could write the standard, what would it be? Your Honor, I think a reckless indifference standard would both afford greater protection under the Fourteenth Amendment, which someone like Mr. Willey should be entitled to, and it would also be consistent with the Supreme Court's determination that negligence is never enough to support a Section 1983 claim. What's your best case to show reckless indifference is the standard under the Fourteenth Amendment in a case like this? Do you have one? My best case to show that that should be the standard? Yes. Well, I actually pulled this standard from a case in the District of Nevada called Doris v. County of Washoe. This case was cited, actually, by the district court in their original order dismissing the Mr. Willey's complaint with leap to amend. He later amended, and then that complaint went forward. Has any court of appeals made such a ruling that you're advocating here? No. No court of appeals that I'm aware of has made a ruling advocating this reckless indifference standard, although the Ninth Circuit in Lawley v. County of Orange and Gibson v. County of Washoe suggested that a lower standard could apply. Could be. And naturally, the deliberate indifference standard, which is applied under the Eighth Amendment, is a very high standard, very rigorous standard. To take that to refer to an appellate jurisprudence as walking up to the line but not stepping over it, let's assume that we agree with you that this reckless indifference standard should apply. Tell us how the facts of this case would meet that standard. Okay. Well, the standard to articulate the standard for us How your client with this wonderful is this his real name? Well, my understanding, Your Honor, although we've never had a discussion with Mr. Willie about this, is that this is not his real name. His real name is something else. He changed it to Chili Willie to honor his grandmother, whose nickname was Willie, and because he is a southwestern chef and his signature dish is chili. Explain to us how, if we were free to apply the standard, you suggest that Chili Willie could meet the standard. Absolutely. This is a guy who came in as a pretrial detainee, and when he was asked what medications he was taking, he said, Serazone, OxyContin, Klonopin, Ambien, Quinine, and Aspirin. And his contention is, isn't it, that they didn't allow him to continue his medication regime? Mr. Willie's contention is that he was on a course of treatment, prescribed by a physician, his physician, Dr. Gruber, and that he should have, that Dr. Gruber should have been consulted, and that the, and at the very least, that did not happen. But didn't they try to get a hold of Dr. Gruber and he didn't respond? At least that's what the record shows. The record indicates that there was a fax that was sent to Dr. Gruber's office, but there was no other attempt made to contact Dr. Gruber. Mr. Willie submits that Dr. Gruber's office was just right across the street from the detention facility. Some of these drugs are sort of things that are, that are abused all the time, aren't they, like OxyContin? That's a, that's one of the most abused drugs in the whole country. Your Honor, I, I don't know, but I, I believe, I believe you. I, I think that Mr. Willie, that whether or not Mr. Willie was abusing these drugs, I think it's something that the physician should have determined after consultation with Dr. Gruber. Or at least given. Say Dr. Gruber's office was right across from the jail? That is what Mr., Mr. Willie submits, Your Honor. Sounds like it's in a good place for abuse of drugs. At the very least, if they were truly unable, and, and Mr. Willie believes that they didn't make a significant effort to contact his, his physician, certainly outside of the context of a detention facility, a physician would consult or make a more effort to, to reach someone's physician before effectively cutting them off cold turkey from prescribed medications. But they did have some sort of medical personnel that looked at his case, right? And decided to wean him off some of these drugs. Yes, Your Honor. There were medical personnel that evaluated his case and, and made this determination for the course of treatment. Although the, the treatment was very severe. And they, they essentially cut him off from these prescribed medications. And, and in the record too, it, it took them eight months before they put him back on to stronger medications for his pain and his, his mental illness. Those three medications were Vicodin, Elevil, and Desalcid, which are strong medications. After that there's evidence in the record that Mr. Willie's health improved. And, and, and so that alone, those eight months during which he had to deal with this, this effective cold turkey and, and the complete withdrawal from his prescribed medications is the pain and suffering, is the inadequate medical treatment for which he seeks relief. Do you admit that under the deliberate indifference standard that, that the jail met that because they did have medical personnel that looked at his records and decided this is what he should have? Do you admit that? Yes, Your Honor. We believe, we believe that we have met the deliberate indifference standard because. Oh, you've met it, okay. We, we believe that we have met the deliberate indifference standard if this Court chooses not to, to announce a, a lower standard for, for people like Mr. Willie who have not been convicted of any crime. That obviously is a much more difficult standard to meet, but here you have, as I said, a course of treatment that, that consciously disregarded a prior course of treatment through a prescribed, through a licensed physician, denied him the, the medications that he needed to treat his pain and his mental illness for 8 months before they gave him medication that, that alleviated his symptoms. Are you saying that when a person goes to prison, that not under this situation as a pretrial detainee, but after trial, that when he goes to prison, the prison authorities don't have the right to have their own doctor consider the medical situation and say we shouldn't put this man back on Oxycontin or Klonopin or some of these other things? I, I notice I'm out of time, time, Your Honor. You can answer, go ahead and answer. Okay, thanks. No, Mr. Willie's position is, is not that the prison authorities don't have the authority to have their own medical personnel treat an individual. And certainly in the context of a prison, when you're dealing with convicted inmates, there's already been due process. And there's already been a trial by jury, if so demanded, an adjudication of guilt. And so that convicted, you know, prisoner has already been had certain, certain liberty interests taken away from him. And therefore, he is. He has the right to medical treatment. He has a right, absolutely, Your Honor. But a higher standard would apply. And it makes sense that a higher standard would apply. What Mr. Willie submits is that for someone who hasn't been convicted of, of any crime and there hasn't been due process, a lower standard should apply. And, and that lower standard should take into account that they, that there should be a greater greater protections for someone in that situation. Okay. Thank you. We'll give you a little time for rebuttal. Okay, thank you. We'll hear from the county at this time. Your Honor, I don't think that we need to follow the first orders of the medical defendants. That's fine. Jerome Veronini representing Appellees Luters, Daigie, Hibbard, and Purcell. I'd like to talk about what really happened in the Willie case. And that is, when he came to the jail and was booked, he was looked at by the mental health personnel. Not the medical personnel, but mental health. Because in fact, he was determined by them, because of the use of Klonopin, to be in need of mental review. They found that he was needed to be withdrawn, to be taken off the heavy doses of medication that he had been given by the outside doctor. They directed, they asked the medical personnel to put Mr. Willie on a withdrawal protocol. He wasn't abandoned. He wasn't left to suffer without being seen medically. He was put on a prescribed withdrawal protocol to get him off of the medications that he had been on for a long period of time inappropriately. And in fact, the record shows that when he had been to a place called Copper Towers, which is a clinic north of the jail sometime before, several months before, they had cut him off, talked about him being in withdrawal, and threw him out of the clinic. So we don't have someone here who comes in pristine clean with a list of medications that he'd been taking, and all of a sudden he's thrown in the wastebasket and disregarded by medical personnel. That's not what happened. He was put on a withdrawal protocol. He was observed. He was checked. And then as he progressed through the week-long, weeks-long withdrawal protocol, he was again assessed by the doctors, Luters and Hibbard, and determined what kind of medication he needed with the idea that he had been addicted to the previous medications. So there was a conscious application of medical principles and reasoning by Dr. Luters and Dr. Hibbard in determining what to do. And why that's important is that's what we put in front of the trial court as a subjective thinking of the medical personnel defendants as to what they did, why they did what they did. And the court found that there was ample evidence that what the physicians had done at the jail was appropriate and proper. Very straightforward question. Mr. Willie was given appropriate treatment. On what basis did medical or mental health personnel at the facility determine that Mr. Willie was abusing these meds? Well, the first instance was when mental health, which, again, isn't the medical personnel. It's a different group of people. When they saw the level of Klonopin that Mr. Willie had been taking, Klonopin is a heavy-duty psychotic medication. He had been taking it at levels that they thought were distressing. They thought that given his presentation and given the fact that he was complaining about mental health problems at the time of intake, he needed to be withdrawn from those medications. Was any determination made at that point or any time in the ensuing eight months that this was not pursuant to a prescription? We contacted or tried to contact Dr. Gruber. In fact, sent him a fax with a consent and release. And the way it works in the real world is that you don't get records from an outside providing doctor unless you give him or her a release. There's something called HIPAA, Health Information Privacy Protection Act, which prohibits doctors and providers from giving away records without that kind of consent that we sent to Dr. Gruber in this case. We never got a response from Dr. Gruber. But his attorney says that Dr. Gruber is right across from the jail. Was that ever considered? Well, he is. I think he was or is right across from the jail. I should also point out to the Court that in the supplemental excerpts of the record on page 190, during a hearing in the criminal court in Sonoma County, Mr. Willie's criminal lawyer talked to the Court about the problem that he couldn't get a response from Dr. Gruber. So not only did we not get a response from Dr. Gruber, nobody that tried, including Mr. Willie, to get a response from Dr. Gruber ever got a response from Dr. Gruber. So the Dr. was Dr. Gruber, you know, was he a mental health specialist or just a general practitioner? He is known by our personnel to be a doctor who runs a pain clinic. And that has to become Was he an M.D., D.O. Oh, he's an M.D., Your Honor. Yes, M.D. But he's not a psychiatrist or mental health expert, as you know. No, he's not a psychiatrist. That's correct. Right. So that's the sequence of events. So we're presented with Mr. Willie at ADMIT, who's on this heavy dose of medications. We send for the records. We don't get the records. At that point, we're following the mental health recommendation that we withdraw Mr. Willie from these medications. I guess maybe an appellant's counsel would have us do nothing while we wait, maybe walk across the street, knock on Dr. Gruber's door, see if he bothers to answer. But he's got a fax in his office with a consent, and he doesn't bother to send the records to us. And later on, he doesn't bother to send the records to anybody. We did what we could do, what we were supposed to do, to try to find out why he was prescribing this heavy dose of a basket full of medications, some of which, as the Court noted, are really quite potent and quite potentially damaging to the user of the drugs. With respect to the Court's decision, I think the Court applied the correct standard. There is no case that says there's a different standard with pretrial detainees. Should there be? No, there shouldn't be. And I'll tell the Court why. Because if you look at the subjective component of the Eighth Amendment test, that component sets forth the mental thinking, and in the case of a doctor, the medical processing and thinking that he or she did with respect to their care and treatment of the inmate. That tells you everything about their thoughts, their analysis, their diagnosis, their prognosis, and their plan of treatment. That's not going to be any different irrespective of what label you put on that. You could call that whatever you want, but you're still going to be, the Court's still going to be looking at why the doctor did what he did or she did or didn't do what they didn't do, and whether or not there was a sound basis for that. Well, counsel, do you see a distinction between deliberate indifference and reckless indifference? I don't think so, Your Honor. I don't know how you'd find indifference when you factor in the need on the part of the Court under the deliberate indifference standard to look at what the thinking of the doctor was. I mean, you look at what he or she did, and then you could put the label on that, reckless indifference or conscious disregard. The question still is, did the doctor do what he or she thought was proper? Or did they withhold care? Or did they not know enough to know what the proper care was? Well, or did they just recklessly not attend to the patient? Well, I don't know how that would be different from a doctor being deliberate indifferent, deliberately indifferent to a patient's presentation and problems. I mean, I don't know where you'd draw the line. You're down to about three minutes. Do you want to save some time for your co-counsel?  Ms. Freeman? Thank you for your argument, counsel. Yes, ma'am. Thank you, Your Honors. Bonnie Freeman appearing on behalf of the county appellees. One question the Court did ask about segregation of inmates within the county's facility. That does not happen. Pre-trial detainees are housed not segregated from those who are no longer pre-trial detainees. So as a matter of policy, the county treats people convicted of a crime and therefore deprives liberty with people who simply for one reason or another, including money, can't afford bail. Well, putting it another way, yes. The answer is yes. Yes, the answer is yes. The facility is not designed that way. The facility is an actually rather unique design. But administratively, they can't do that either. Just movement of prisoners, housing of not prisoners, but these people confined within the county jail, the housing and getting them to and from the courthouse, which is actually attached to the main adult detention facility, it simply could not work in our facility. But I did want to address that question. And very briefly, the two issues that obviously the county does have an interest in that are raised by Mr. Willey's appeal are the question about whether the trial judge abused her discretion in failing to appoint counsel sooner. I think that the record is abundantly clear that Judge Wilken took every effort, every time a suggestion was made that counsel needed to be appointed, she considered the request and rightfully exercised her discretion in allowing the case to move forward until such time that the meritorious claims could be disseminated from those which were the unmeritorious claims. Mr. Willey aptly represented himself, as the Court, I'm sure, has seen through the volumes of written correspondence that Mr. Willey submitted on his own behalf. He was capable of very coherent thought. In fact, I always looked forward to whatever it was he was submitting, because it was always interesting and it was always unique. And he expressed himself very well. And the Court took, must have taken that into consideration. There's no evidence that the trial judge did not take that into consideration. Sotomayor, did he get adequate discovery? I'm sorry? Did he get adequate discovery? Well, he had two years to conduct discovery, and he certainly knew how to do it. The record reflects that he served subpoenas, that he knew how to draft written what he called deposition questions, although it's unclear who they were directed to. And that there was a period, which is commented on by the trial judge in one order, that there was a whole year where there was no activity on the case whatsoever, which prompted Judge Wilkin to then say, either you're going to prosecute this case or you're not. He clearly knew how to conduct discovery, and I think the record reflects that. And that the discovery that he did send, or excuse me, if I can back up a bit, the Ninth Circuit, with regard to fact-finding abilities of proper plaintiffs, has already held that the fact that there is a need for more discovery or more facts to be gathered is not an extraordinary circumstance which would allow the Court to appoint counsel to represent that person. And in such a case, every case would warrant exceptional circumstances, and counsel would have to be appointed to everyone, incarcerated or not. And I think that, and that's the Wilborn decision, which is a good decision, and discusses at some length the necessary requirements that must be established before counsel can be appointed. I am out of time, Your Honor. If there are any questions? I don't see any. Thank you for your argument. About one minute for rebuttal. Okay, Your Honor. I would just like to briefly address the standard that we proposed, the reckless indifference standard, and that it would actually be different and it can be articulated clearly. The standard proposed in the County of Washoe case I mentioned earlier was that the defendant would be liable where either he actually knew of the risk of harm, which is the deliberate of facts which clearly would lead any reasonable person to conclude that there was a risk of harm. But the defendant did not draw that conclusion himself. I believe this is a clearly articulable standard, and it does, what it eliminates, Your Honor, is the subjectivity of the deliberate indifference standard. Under the deliberate indifference standard, you must prove not only that the course of treatment was improper, but that the physician knew that the course of treatment was improper and proceeded anyway. Tell us how it was recklessly indifferent for the medical-slash-mental health personnel in this case, faced with a lack of response from the apparently prescribing physician, to proceed in the way that they did. Your Honor, Ms. Freeman mentioned that there's a voluminous record in this case of what Mr. Willie tried to submit to the district court. Give us the three-sentence summary. There were voluminous complaints that the treatment was not working. They ignored those. First, they ignored Dr. Gruber's prescribed medication. And finally, they got no what Dr. Gruber thought about the case, because they got nothing from him, right? Exactly. And we believe that the medical personnel did not take appropriate steps to obtain that information from Dr. Gruber. Okay. Thank you. Thank you for your argument. Thank both sides for their argument. The case, as argued, will be submitted for decision. Do you want to go on? Sure. Okay. Do you want to go on? Okay. Court's going to take about a five-minute recess. If counsel on direct TV will come forward and be ready to go, we'll be back out in about five or six minutes. All rise. We hope you find this gift informative in your decision-making. Thank you for being here, counsel. Thank you for your hard work, counsel. We hope you found this gift informative in your decision-making.  We hope you find this gift informative in your decision-making.  Thank you for your hard work, counsel. Thank you for your hard work, counsel.
judges: B. Fletcher, Siler , Hawkins